**TAX COURT OF NEW JERSEY**



**JOSHUA D. NOVIN**
**Judge**

Dr. Martin Luther King, Jr. Justice Building
495 Dr. Martin Luther King, Jr. Blvd., 4th Floor
Newark, New Jersey 07102
Tel: (609) 815-2922, Ext. 54680

**NOT FOR PUBLICATION WITHOUT THE APPROVAL**
**OF THE TAX COURT COMMITTEE ON OPINIONS**

March 16, 2022

Nathan Wolf, Esq.
Wolf Vespasiano LLC
331 Main Street
Chatham, New Jersey 07928

Joseph Sordillo, Esq.
DiFrancesco, Bateman, Kunzman, Davis, Lehrer & Flaum, P.C.
15 Mountain Boulevard
Warren, New Jersey 07059

      Re:    <u>Calandra, Luciano Jr. & Teresa L. v. Montclair Twp.</u>
             Docket Nos. 005048-2018, 003614-2019, 005753-2020

Dear Mr. Wolf and Mr. Sordillo:

This letter constitutes the court's opinion following trial in the above-referenced matters challenging the 2018, 2019, and 2020 tax year assessments on plaintiffs' single-family residence.

For the reasons stated more fully below, the court affirms the 2018, 2019, and 2020 tax year local property tax assessments.

## I.    <u>Procedural History and Factual Findings</u>

Luciano Calandra, Jr. and Teresa L. Calandra ("plaintiffs") are the owners of the single-family residence located at 164 Wildwood Avenue, Montclair Township, Essex County, New Jersey. The property is identified on defendant, Montclair Township's ("Montclair") municipal tax map as Block 2504, Lot 7 (the "subject property"). For the 2018, 2019, and 2020 tax years, the subject property's local property tax assessment was as follows:

| | |
|---|---|
| Land: | $ 429,600 |
| Improvements: | $1,241,000 |
| Total | $1,670,600 |






The average ratio of assessed to true value, commonly referred to as the Chapter 123 ratio, for Montclair for the 2018 tax year is 100%, for 2019 tax year is 90.23% and for the 2020 tax year is 89.51%. See N.J.S.A. 54:1-35a(a). When the average ratio is applied to the local property tax assessment, the subject property's implied equalized value is: (i) $1,670,600, for the 2018 tax year; (ii) $1,851,491, for the 2019 tax year; and (iii) $1,866,384, for the 2020 tax year.

Plaintiffs timely filed direct appeals with the Tax Court challenging the subject property's 2018, 2019, and 2020 tax year local property tax assessments. In response, Montclair filed counterclaims for the 2019 and 2020 tax years.

During trial, both plaintiffs and Montclair offered testimony from State of New Jersey certified general real estate appraisers, who were accepted by the court as experts in the property valuation field, without objection.[1] Each expert prepared an appraisal report that was admitted into evidence by the court.[2][3]

Based on the evidence presented, the court concludes that the subject property is a 2½ story Tudor colonial-style, single-family residence constructed in approximately 1902, situated on a .512-acre rectangular shaped lot. The subject property has approximate lot dimensions of 100'

---

[1] Due to witness availability, scheduling, and illness issues, these matters were tried to conclusion over several months.

[2] Plaintiffs' expert prepared a Restricted Appraisal Report dated July 24, 2020.

[3] On the August 27, 2021 trial commencement date, plaintiffs marked for identification an appraisal report dated August 19, 2021, prepared by plaintiffs' expert. Defendant's counsel objected to any testimony from plaintiffs' expert based on this appraisal report, as it was prepared eight days prior to trial, was not produced during discovery, and was not produced in accordance with the court's February 22, 2021 Case Management Order. The court barred plaintiffs' expert from offering testimony regarding the August 19, 2021 appraisal report. However, the court permitted plaintiffs to introduce and offer testimony on the July 24, 2020 Restricted Appraisal Report and four amendment pages to the July 24, 2020 Restricted Appraisal Report. The four amendment pages included a series of mathematical and typographical corrections to the Restricted Appraisal Report.






wide and 223' deep. The property contains a manicured landscape with a home finished in white stucco and dark brown trim. The gross living area of the residence is 5,412 square feet, consisting of 7 bedrooms, 5 full bathrooms, and 1 half-bathroom.[4] The first floor of the residence includes an eat-in kitchen, foyer, dining room, den, sunroom, butler's pantry, mudroom, and half bathroom. The second floor of the residence includes the master bedroom, master bathroom, four bedrooms, three full bathrooms, and a small balcony. The third floor includes two bedrooms, a family room, and one full bathroom. A total of five fireplaces are found in the 2½ stories. The subject property's kitchen is well appointed with white wood cabinetry, stainless steel appliances, granite/quartzite countertops, a center island, a farmhouse style sink, a subway tile backsplash, and ceramic tile flooring.[5] The dining room features built-in wood cabinetry and a coffered ceiling with French doors that open onto the sunroom. The witness testimony and the court's review of the interior photographs discloses that although well-maintained and functional, the subject property's bathrooms have not been recently fully renovated and do not have features found in several other homes in the subject property's market area.[6] For instance, the subject property's master bathroom contains three fixtures, a stall shower, a single console sink, and a toilet. The unfinished basement contains a laundry area, a storage area, and an area containing approximately twenty-one wine

---

[4] The subject property's total number of rooms was disputed during trial. Plaintiffs' expert opined that the subject property contains 13 total rooms. Conversely, Montclair's expert opined that the subject property contains 15 total rooms. Nonetheless, the experts agreed that the subject property contains 5,412 square feet of gross living area. The court finds the total number of rooms in the subject property inconsequential for purposes of determining its true or fair market value.

[5] Plaintiffs' expert testified that he considered the subject property's kitchen "higher-end."

[6] Plaintiffs' expert offered that the subject property was renovated in the 2000's; however, he was unsure of the date. Montclair's expert offered that the subject property was renovated over the years, however he was unsure of the last date of renovations.






storage cubes stacked in seven columns, each column bearing a height of approximately six feet.[7]

In addition, the property contains a two-car detached garage, an in-ground pool with spa, a covered

outdoor patio, and an open porch. Plaintiff, Luciano Calandra, Jr., acquired the subject property

on August 27, 2003, for a reported consideration of $1,325,000.

The subject property is situated in the Watchung Plaza neighborhood of Upper Montclair,

located approximately two blocks from the Watchung Avenue Station, providing N.J. Transit

commuter rail service.

Finally, the home is in Montclair's R-1, One Family Residence District. Principal uses

permitted in the district include one-family detached dwellings, carriage houses (where qualified

as a permitted use), and municipal facilities. Therefore, the subject property is a legally permitted

and conforming use within the R-1 zoning district.

## II. Conclusions of Law

### a. Presumption of Validity

"Original assessments and judgments of county boards of taxation are entitled to a

presumption of validity." MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J.

Tax 364, 373 (Tax 1998). "Based on this presumption, the appealing taxpayer has the burden of

proving that the assessment is erroneous." Pantasote Co. v. Passaic City, 100 N.J. 408, 413 (1985)

(citing Riverview Gardens v. North Arlington Bor., 9 N.J. 167, 174 (1952)). "The presumption of

correctness . . . stands, until sufficient competent evidence to the contrary is adduced." Little Egg

Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998). A taxpayer can only

---

[7] Montclair's expert characterized the unfinished basement area where the wine storage cubes are stacked as a "small temperature controlled wine cellar." However, no credible evidence was introduced that this area is a separate room or contains a temperature regulating device.






rebut the presumption by introducing "cogent evidence" of true value; that is, evidence "definite, positive and certain in quality and quantity to overcome the presumption." Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105 (1952). Thus, at the close of plaintiff's proofs, the court must be presented with evidence which raises a "debatable question as to the validity of the assessment." MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376. "Only after the presumption is overcome with sufficient evidence . . . must the court 'appraise the testimony, make a determination of true value and fix the assessment.'" Greenblatt v. Englewood City, 26 N.J. Tax 41, 52 (Tax 2011) (quoting Rodwood Gardens, Inc. v. City of Summit, 188 N.J. Super. 34, 38-39 (App. Div. 1982)).

At the close of plaintiffs' proofs, Montclair moved to dismiss these matters under R. 4:37-2(b), arguing that plaintiffs failed to overcome the presumption of validity and that plaintiffs' expert's conclusions of value amounted to net opinions. The court denied Montclair's motion and placed a statement of reasons on the record.

However, concluding that the presumption of validity has been overcome does not equate to a finding by the court that the tax assessment is erroneous. Once the presumption has been overcome, "the court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co. v. Edison Twp., 127 N.J. 290, 312 (1992). Here, although the proofs, when measured against the liberal standards employed in evaluating a motion under R. 4:37-2(b), were sufficient to overcome the presumption of validity at the close of plaintiff's case-in-chief, "the burden of proof remain[s] on the taxpayer . . . to demonstrate that the judgment under review was incorrect." Id. at 314-15 (citing Pantasote Co., 100 N.J. at 413).

b. Highest and Best Use

"For local property tax purposes, property must be valued at its highest and best use."






Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 545 (Tax 2000). The determination of the highest and best use of a property is "the first and most important step in the valuation process." Ford Motor Co. v. Edison Twp., 10 N.J. Tax 153, 161 (Tax 1988), aff'd, 127 N.J. 290 (1992). The highest and best use analysis involves the "sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive." Clemente v. South Hackensack Twp., 27 N.J. Tax 255, 267-69 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015).

Here, plaintiffs' expert and Montclair's expert both opined that the highest and best use of the subject property, as improved, was the continuation of the subject property's use as a single-family residence, and, as vacant, was for development of a single-family residence.[8] The court accepts the experts' highest and best use conclusions.

### c. Valuation Approach

"There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App. Div. 2001) (citing Appraisal Institute, The Appraisal of Real Estate 81 (11th ed. 1996), certif. denied, 168 N.J. 291 (2001)). "[T]he answer as to which approach should predominate depends upon the facts in the particular case." WCI-Westinghouse, Inc. v. Edison Twp., 7 N.J. Tax 610, 619 (Tax 1985), aff'd, 9 N.J. Tax 86 (App. Div. 1986).

---

[8] Plaintiffs' expert's "Restricted Appraisal Report" did not contain a detailed discussion of his highest and best use analysis. Rather, the report simply states: "[a]fter careful consideration of all factors including the property's physical, legal and economic characteristics, it is our opinion that the highest and best use of the subject site, as vacant, is for development of a residential dwelling. The highest and best use of the subject site, as improved, is for the continuation of its use as a single-family residential dwelling."






The sales comparison approach derives an opinion of market value "by comparing properties similar to the subject property that have recently sold, are listed for sale, or are under contract." Appraisal Institute, The Appraisal of Real Estate 377 (14th ed. 2013). The sales comparison approach involves a "comparative analysis of properties" and requires the expert to focus on the "similarities and differences that affect value . . . which may include variations in property rights, financing, terms, market conditions and physical characteristics." Id. at 378. "When data is available, this [approach] is the most straight forward and simple way to explain and support an opinion of market value." Greenblatt, 26 N.J. Tax at 53 (citing Appraisal Institute, The Appraisal of Real Estate 300 (13th ed. 2008)).

Plaintiffs' expert and Montclair's expert both employed the sales comparison approach to derive an opinion of the subject property's true or fair market value as of each valuation date. In plaintiffs' expert's opinion, the true or fair market value of the subject property was: (i) $1,400,000, as of the October 1, 2017 valuation date; (ii) $1,400,000, as of the October 1, 2018 valuation date; and (iii) $1,450,000, as of the October 1, 2019 valuation date. In Montclair's expert's opinion, the true or fair market value of the subject property was: (i) $1,900,000, as of the October 1, 2017 valuation date; (ii) $1,930,000, as of the October 1, 2018 valuation date; and (iii) $1,965,000, as of the October 1, 2019 valuation date.

Here the court concludes, as did the experts, the sales comparison approach is the most appropriate method to determine the subject property's true or fair market value.

1. Plaintiffs' expert

In plaintiffs' expert's opinion, the subject property is in "average condition," having an effective age of 15 years and a remaining economic life of 35 years.

In conducting his sales comparison approach, plaintiffs' expert identified twelve property






sales. Four sales he deemed comparable to the subject property as of the October 1, 2017 valuation date; four sales he deemed comparable to the subject property as of the October 1, 2018 valuation date; and five sales he deemed comparable to the subject property as of the October 1, 2019 valuation date. Plaintiffs' expert considered one of the sales comparable for both the October 1, 2017 and October 1, 2018 valuation dates.

In performing his analysis, plaintiffs' expert offered that he reviewed the New Jersey Multiple Listing Service ("NJMLS") listings and selected sales based on location, size, and condition, because in his view, those factors drive sales and market value. Copies of the NJMLS listings for each of the twelve sales, including the NJMLS exterior and interior photographs, were identified by plaintiffs' expert, and offered into evidence. In addition, plaintiffs' expert testified that he telephoned the real estate agents involved in each of the twelve transactions and verified the terms of sale and the accuracy of the property descriptions contained on the NJMLS. The expert further offered that he reviewed the interior photographs contained on the NJMLS website for each of the twelve comparable sales.

Plaintiffs' expert applied a series of adjustments to each of the twelve sales to account for perceived value differences for: (i) lot size, at $3.00 per square foot; (ii) full bathrooms, at $20,000; (iii) half bathrooms, at $10,000; (iv) gross living area, at $100 per square foot; (v) finished basement, at $40,000[9]; and (vi) the absence of an in-ground pool, $40,000.

Notably, during direct examination plaintiffs' expert testified that he performed a paired sales analysis to derive his lot size and gross living area adjustments. However, his appraisal report did not contain the data, support, and analysis for plaintiffs' expert's adjustments. Rather,

---

[9] During trial, plaintiffs' expert submitted that on reflection, due to the condition of the finished basements in his comparable sales, "maybe this adjustment is a little light and should be $50,000."


Interpreter


ADA
Americans with
Disabilities Act


ENSURING
AN OPEN DOOR TO
JUSTICE



plaintiffs' expert submitted that his paired sales analyses were contained in his work file.[10]

Plaintiffs' expert testified that he performed a paired sales analysis of three sets of single-family residence sales in Montclair to calculate his lot size adjustments. The six sales took place between November 2016 and November 2017. After reviewing the paired sales, plaintiff's expert opined that lot size adjustments range from $2.87 to $4.60 per square foot. Therefore, he opined that a $3.00 per square foot lot size adjustment was appropriate.

In addition, plaintiffs' expert submitted that he performed a gross living area or square foot adjustment based on a paired sales analysis of five sets of single-family residence sales in Montclair. The ten sales took place between May 2017 and November 2017. After reviewing the paired sales, plaintiff's expert opined that the gross living area or square footage adjustments range from $94.14 to $122.72 per square foot. Therefore, he opined that a $100.00 per square foot gross living area adjustment was appropriate.

To compute his finished basement and in-ground swimming pool adjustments, plaintiffs' expert consulted the Core-Logic Marshall and Swift Cost Manual ("Manual") and engaged in discussions with market participants. However, upon reflecting on his finished basement adjustment and the condition of the finished basements in his comparable sales, plaintiffs' expert offered, "maybe this adjustment is a little light and should be $50,000." Additionally, to derive his in-ground pool adjustment, plaintiffs' expert testified that the Manual's "cost to build" an "in-

---

[10] During cross-examination, plaintiffs' expert testified that because he prepared a "Restricted Appraisal Report," the data supporting his lot size, gross living area, and in-ground pool adjustments were not contained in the report. Rather, the support for those adjustments was contained in his work file. Accordingly, Montclair's counsel requested plaintiffs' expert produce copies of his work file and requested an adjournment of cross-examination until plaintiffs' expert produced his work file. The court granted Montclair's counsel's request, directing plaintiffs' counsel to arrange with Montclair's counsel and plaintiffs' expert to produce his work file.






ground gunite type pool[]," "is around $40,000."

However, cross-examination revealed that to ascertain the gross living area for each of his twelve comparable sales and five sets of paired sales, plaintiffs' expert relied only on information contained on the NJACTB.org website. Cross-examination further divulged that plaintiffs' expert determined the lot sizes for each of the twelve comparable sales and his three sets of paired sales transactions only from information contained on the NJACTB.org website. Plaintiffs' expert did not review the property record cards for any of the twelve comparable sales, nor did he review the property record cards for any of the sixteen sales involved in his gross living area or lot size paired sales analyses. Moreover, plaintiffs' expert did not verify or confirm either the gross living area or lot sizes reported on the NJACTB.org website with any representative of Montclair. In addition, plaintiffs' expert did not submit a request to Montclair under the New Jersey Open Public Records Act, N.J.S.A. 47:1A-1 to -4, to request any of this information.

Cross-examination further disclosed that plaintiffs' expert did not speak with transaction participants (buyers, sellers, brokers, or attorneys) for any of the sixteen sales comprising his paired sales analyses. Plaintiffs' expert only reviewed the NJMLS listings and the NJACTB.org website for information on these sales.

For the 2018 tax year, the unadjusted sale prices of plaintiffs' expert's four sales range from $1,175,000 to $1,300,000, reflecting values of $249.15 to $313.25 per square foot. Plaintiffs' expert applied gross adjustments to the four sales ranging from $159,605 to $255,052 and net adjustments ranging from $7,395 to $222,140. As a result, the gross adjustments amounted to between 12.87% and 21.57% of the sale prices, and the net adjustments amounted to between .59% and 18.90% of the sale prices. In sum, the adjusted sale prices of plaintiffs' expert's four 2018 sales range from $1,247,395 to $1,475,052. For the 2018 tax year, plaintiffs' expert concluded a






value of $1,400,000.

For the 2019 tax year, the unadjusted sale prices of plaintiffs' expert's four sales range from $1,175,000 to $1,490,000, reflecting values of $240.96 to $284.69 per square foot. Plaintiffs' expert applied gross adjustments to the four sales ranging from $204,312 to $253,460, and net adjustments ranging from -$164,312 to $222,140. The gross adjustments amounted to between 12.87% and 21.57% of the sale prices, and the net adjustments amounted to between 2.16% and 18.90% of the sale prices. The adjusted sale prices of plaintiffs' expert's four 2019 sales range from $1,271,872 to $1,407,800. For the 2019 tax year, plaintiffs' expert concluded a value of $1,400,000.

For the 2020 tax year, the unadjusted sale prices of plaintiffs' expert's five sales range from $1,200,000 to $1,397,000, reflecting values of $244.62 to $334.21 per square foot. Plaintiffs' expert applied gross adjustments to the five sales ranging from $77,410 to $254,901 and net adjustments ranging from $54,603 to $174,901. The gross adjustments amounted to between 10.77% and 18.24% of the sale prices, and the net adjustments amounted to between 4.37% and 13.54% of the sale prices. As a result, the adjusted sale price of plaintiffs' expert's five 2020 sales range from $1,277,410 to $1,571,901. For the 2020 tax year, plaintiffs' expert concluded a value of $1,450,000.

2. Montclair's expert

In Montclair's expert's opinion, the subject property is in "good condition."

In conducting his sales comparison approach, Montclair's expert also identified twelve property sales. Four sales he deemed comparable to the subject property as of the October 1, 2017 valuation date; four sales he deemed comparable to the subject property as of the October 1, 2018 valuation date; and four sales he deemed comparable to the subject property as of the October 1,






2019 valuation date. However, 2018 tax year sale #3 and 2019 tax year sale #2 is the same property that was resold approximately eighteen months after the original sale.

In performing his analysis, Montclair's expert testified that his focus centered on sales of single-family homes in the subject property's neighborhood that were between 4,000 and 6,000 square feet. To verify the accuracy of each sale, Montclair's expert testified that he reviewed the Garden Statement Multiple Listing Service ("GSMLS") listings and photos, reviewed seller disclosure statements, verified the sale transaction details with a broker, reviewed copies of the deeds, reviewed Montclair's property record cards, spoke with Montclair's municipal tax assessor, and reviewed copies of building permits, if any, for each of his twelve comparable sales.[11]

Montclair's expert also applied a series of adjustments to his twelve sales to account for perceived value differences for: (i) full bathrooms, at $50,000; (ii) half bathrooms, at $25,000; (iii) gross living area, at $195 per square foot; (iv) finished basement, at $25,000; (v) additional garages, at $25,000; and (vi) the absence of an in-ground pool, $75,000. However, in Montclair's expert's opinion, "based on my experience in the Montclair market, forty-years," minor lot size disparities are not recognized by the market. Thus, excepting one sale containing a "lot area significantly larger than the subject" property, to which Montclair's expert applied a downward adjustment of 5% or $4.00 per square foot, he did not adjust his comparable sales to account for lot size differences.

To calculate his gross living area adjustment, Montclair's expert conducted a paired sales analysis of two single-family residence sales in Montclair. The two sales took place in June 2018. Just as he opined with respect to his analysis of the comparable sales, Montclair's expert concluded

---

[11] Cross-examination disclosed that copies of the property record cards and building permits were not contained in Montclair's expert's appraisal report or in his work file.





that minor lot size deviations in the paired sales are not recognized in the market and do not warrant adjustment. After reviewing the paired sales, Montclair's expert opined that a gross living area or square footage adjustment of $195 per square was appropriate.

To compute his bathroom adjustments, Montclair's expert also conducted a paired sales analysis of two single-family residence sales in Montclair. The two sales took place between January 2017 and March 2017. After reviewing the paired sales, Montclair's expert opined that a full bathroom adjustment of $50,000 was appropriate. Consequently, Montclair's expert opined that a half bathroom adjustment of $25,000 was appropriate.

In Montclair's expert's opinion, it is difficult to perform a paired sales analysis in Montclair to account for differences in the finished basement, garages, or the absence of an in-ground pool because Montclair contains no "cookie-cutter homes, . . . virtually every house in Montclair is different from one another." Stated differently, because no two homes in Montclair are entirely identical, a paired sales analysis is both challenging and time-consuming.[12] Accordingly, Montclair's expert did not perform a paired sales analysis to compute adjustments for finished basements, garages, or the absence of in-ground pools. Rather, Montclair's expert testified that he engaged in discussions with Montclair's tax assessor and "local real estate agents" to attempt to gauge the marketplace's reaction to the presence or absence of these elements.

However, cross-examination revealed that Montclair's expert did not conduct a separate paired sales analysis to discern his half bathroom adjustment of $25,000. Rather, he simply multiplied his full bathroom paired sales analysis figure by 50% to discern his half bathroom adjustment. In addition, in conducting his full bathroom paired sales analysis, Montclair's expert

---

[12] During cross-examination, Montclair's expert stated that one of the challenges in performing a paired sales analysis is that "it takes months to develop a true paired sale."





adjusted "Sale B" of his paired sales upwards by $49,530, to account for it containing approximately 254 square feet less gross living area than "Sale A" (254 x $195 = $49,530). Thus, plaintiffs' counsel emphasized that if Montclair's expert's $195 gross living area adjustment is viewed as inaccurate, his concluded $50,000 full bathroom adjustment would similarly be inaccurate.

In addition, cross-examination revealed that in Montclair's expert's opinion, the presence of a carriage house should be viewed as contributing an equal value as an in-ground pool. Thus, when a comparable sale possessed a carriage house but no in-ground pool, Montclair's expert opined that they provided equal and offsetting value contributions. However, effective cross-examination disclosed that Montclair's expert offered no supporting data or analysis demonstrating the accuracy of this conclusion, other than his discussions with local real estate agents and Montclair's tax assessor.

For the 2018 tax year, the unadjusted sale prices of Montclair's expert's four sales range from $1,499,000 to $2,100,000, reflecting values of $297.71 to $359.28 per square foot. Montclair's expert applied gross adjustments to the four sales ranging from $132,800 to $198,500 and net adjustments ranging from -$9,400 to $148,500. The gross adjustments amounted to between 6.71% and 13.24% of the sale prices, and the net adjustments amounted to between .44% and 9.90% of the sale prices. In sum, the adjusted sale prices of Montclair's expert's four 2018 sales range from $1,607,800 to $2,090,600. For the 2018 tax year, Montclair's expert concluded a value of $1,900,000.

For the 2019 tax year, the unadjusted sale prices of Montclair's expert's four sales range from $1,600,000 to $2,300,000, reflecting values of $329.28 to $416.20 per square foot. Montclair's expert applied gross adjustments to the four sales ranging from $132,800 to $388,600






and net adjustments ranging from -$197,900 to $338,600. As a result, the gross adjustments amounted to between 8.30% and 21% of the sale prices, and the net adjustments amounted to between 5.17% and 18.30% of the sale prices. The adjusted sale prices of Montclair's expert's four 2019 sales range from $1,682,800 to $2,188,600. For the 2019 tax year, Montclair's expert concluded a value of $1,930,000.

For the 2020 tax year, the unadjusted sale prices of Montclair's expert's four sales range from $1,397,000 to $1,775,000, reflecting values of $334.21 to $402.80 per square foot. Montclair's expert applied gross adjustments to the four sales ranging from $354,700 to $440,200 and net adjustments ranging from $139,100 to $390,200. The gross adjustments amounted to between 20.18% and 31.51% of the sale prices, and the net adjustments amounted to between 7.83% and 27.93% of the sale prices. As a result, the adjusted sale price of Montclair's expert's four 2020 sales range from $1,787,200 to $2,087,400. For the 2020 tax year, Montclair's expert concluded a value of $1,965,000.

3.   Court analysis

a.   Plaintiffs' expert

The sales comparison approach requires appraisers to adhere to a "systematic procedure." The Appraisal of Real Estate at 381. Part of that procedure involves investigation and research of the competitive marketplace for "information on properties that are similar to the subject property." Ibid. However, "[a] crucial element of this investigation and research involves the data verification process." VBV Realty, LLC v. Scotch Plains Twp., 29 N.J. Tax 548, 561 (Tax 2017). To ensure that a credible and reliable conclusion of value is generated, an appraiser must "verify the integrity of the information by 'confirming that the data obtained is factually accurate and that the transactions reflect arm's-length market considerations.'" Ibid. (emphasis






added) (internal citation omitted). Thus, to produce a credible conclusion of value, an appraiser must not only confer with transaction participants to ensure that the sale was not impacted by special considerations and reflects an arms-length transaction but must confirm that the factual data and information forming the elements of comparison and adjustments are accurate.

Plaintiffs' expert was qualified by the court as an expert in real property valuation, thus affording him the ability to offer opinion testimony. See N.J.R.E. 702 (stating that an individual possessing knowledge, skill, experience, training, or education may be qualified by the court as an expert and offer opinion testimony). Although an individual may be duly qualified as an expert and offer opinion testimony, the expert's opinion must nevertheless be rooted in "facts, or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence[,] but which is the type of data normally relied upon by experts.'" Polzo v. County of Essex, 196 N.J. 569, 583 (2008); N.J.R.E. 703. An expert's opinion that is not based on reliable facts or data lacks a credible foundation. "The opinion of an expert depends upon the facts and reasoning which form the basis of the opinion. Without explanation as to the basis, the opinion of the expert is entitled to little weight in this regard." Dworman v. Tinton Falls Borough, 1 N.J. Tax 445, 458 (Tax 1980). The worth, significance, and "probative utility of an expert's opinion stands or falls on the facts and reasoning offered in its support." Bonsangue, 316 N.J. Super. at 284. In sum, an "expert's opinion is only as good as the data upon which the expert relied." Greenblatt, 26 N.J. Tax at 55.

Here, in conducting his sales comparison approach, plaintiffs' expert relied on property data and information he obtained from the NJACTB.org website. However, he did not review the property record cards, engage in discussions with representatives of Montclair, or serve an OPRA request on Montclair to verify if the gross living area and lot size information reported on the






NJACTB.org website was accurate. Similarly, in conducting his lot size and gross living area paired sales analyses, plaintiffs' expert again exclusively relied on property information sourced from the NJACTB.org website without verifying its accuracy or integrity against the property record cards.

Recognizing the potential hazards associated with a blind reliance on information reported on public websites and multiple listing service websites, the Appraisal Institute cautions that "while 'the service will contain fairly complete information about these properties, including descriptions and brokers' names . . . details about a property's square footage, basement area, or exact age may be inaccurate or excluded.'" VBV Realty, LLC, 29 N.J. Tax at 563 (quoting The Appraisal of Real Estate at 119). Thus, an appraiser must confirm the data being relied on is factually accurate.

Here, the NJACTB.org website relied on by plaintiffs' expert for his facts and data, expressly states that the "data available to you, the USER . . . has many sources that are not controlled by NJACTB and it's [sic] agencies." Therefore the "NJACTB does not warrant or guarantee: . . . The accuracy, adequacy, quality, currentness [sic], validity, completeness, or suitability of any data for any purpose . . . The entire he entire risk as to the quality, performance, and the accuracy, adequacy, completeness, currentness [sic], validity, and quality of any data is with the USER."

Accordingly, the court questions the accuracy, reliability, and integrity of the facts, data, and information reported by plaintiffs' expert with respect to his twelve comparable sales and under his paired sales analyses. If any of the data or information on the NJACTB.org website was inaccurate or contained typographical errors or misstatements, then plaintiffs' expert's concluded values were premised on incorrect information and may be erroneous. Similarly, if any of the data






or information on the NJACTB.org website was inaccurate or contained an error, then plaintiff's expert's paired sales analyses may also be misleading, causing rippling distortions in plaintiffs' expert's value conclusions. For example, if the NJACTB.org website contained a typographical error reporting the gross living area of a sale as 5,500 square feet when it should have been reported as 3,500 square feet, that seemingly harmless error could not only affect whether the property is viewed as comparable to the subject property but would also impact the range of adjusted property values and may change the appraiser's concluded value. Employing the $100 per square foot gross living area adjustment adopted by plaintiffs' expert, the error would result in a $200,000 difference in adjusted value. In addition, if information regarding the lot sizes or gross living areas of any of the sixteen paired sales were inaccurate, plaintiffs' expert's proposed adjustments for lot size and the gross living area may also produce an inaccurate result.

Further, assuming that the data is correct, the court has three observations in reviewing plaintiffs' expert's gross living area paired sales analysis. First, none of the properties bear gross living areas remotely comparable to the subject property. The properties relied on by plaintiffs' expert to discern a gross living area adjustment are between 1,286 to 3,058 square feet smaller than the subject property. Thus, the court questions whether the gross living area adjustment for homes between 2,400 and 3,000 square feet parallels the gross living area adjustment for homes between 5,000 and 6,000 square feet. Secondly, in plaintiffs' expert opinion, to determine the subject property's value, adjustments must be made to account for lot size deviations as little as 1,300 square feet. However, the court observes that in identifying his gross living area paired sales, several sets of the paired sales contain lot size differences as much as 3,628 square feet. Yet, plaintiffs' expert made no adjustments to the paired sales to account for these lot size disparities. In sum, there is a lack of internal consistency between the adjustments made by plaintiffs' expert






in conducting his paired sales analysis and in conducting his comparable sales analysis. Finally, because plaintiffs' expert did not speak with the transaction participants (buyers, sellers, brokers, or attorneys) in any of the sixteen sales comprising his paired sales analyses, the court questions whether any of those transactions were impacted, influenced, or affected by special factors that were not readily ascertainable from plaintiffs' expert's review of the NJMLS or NJACTB.org websites.

When the facts underlying or forming the basis of an expert's opinion are uncertain, unconfirmed, or unproven, the court cannot be expected to deduce a value therefrom. For the opinion of an expert to be meaningful, the expert is required to "identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are scientifically reliable." Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992). The weight accorded expert testimony "depends upon the facts and reasoning which form the basis of the opinion. An expert's conclusion can rise no higher than the data providing the foundation." Inmar Associates v. Edison Twp., 2 N.J. Tax 59, 66 (Tax 1980) (citing Passaic v. Gera Mills, 55 N.J. Super. 73 (App. Div. 1959)). Consequently, without credible information and data sustaining plaintiffs' expert's sales, the court is unable to conclude that his gross living area and lot size paired sales analyses are reliable, his twelve sales are comparable and competitive with the subject property, and his overall conclusions of value are credible. Accordingly, because material issues exist with respect to the accuracy, credibility, and reliability of plaintiffs' expert's sales comparison approach, the court accords it no weight.

b. Montclair's expert

At the outset, the court emphasizes that it finds credible Montclair's expert's: (i) testimony that he verified the lot sizes, gross living areas, and property details for each of his twelve






comparable sales by reviewing their property record cards and engaging in discussions with Montclair's tax assessor; (ii) gross living area paired sales analysis and corresponding $195 per square foot gross living area adjustment; (iii) bathroom paired sales analysis and corresponding $50,000 full bathroom and $25,000 half bathroom adjustment; and (iv) in-ground pool adjustment of $75,000. In addition, the court finds credible Montclair's expert's testimony that based on his discussions with market participants and Montclair's tax assessor, no market adjustments are required for minor variations in lot size between comparable properties.

However, cross-examination disclosed that several of Montclair's expert's comparable sales possess material characteristics rendering them not comparable to and thus, competitive with the subject property. Moreover, cross-examination disclosed that Montclair's expert's basement adjustment may not accurately reflect the marketplace's reaction and thus requires modification.

2018 tax year

Cross-examination disclosed that the GSMLS listing for Montclair's expert's 2018 tax year sale #1 detailed that "renovations" were performed including "new plumbing, new roof, new kitchen, new HVAC, new electric, 3.5 new baths." In addition, the court's review of the GSMLS listing revealed that the master bathroom contains "double stall showers and double vanity sinks with marble countertops."[13] Finally, the GSMLS listing details that the home's basement is partially finished. However, Montclair's expert could not state when the subject property was last renovated, expressing instead that the subject property had been renovated "over the years." Moreover, he acknowledged that the subject property's basement is unfinished. Significantly, he made no adjustments to his 2018 tax year sale #1 to account for these seemingly material condition

---

[13] No interior photographs of Montclair's expert's 2018 tax year sale #1 were marked for identification during trial.






variations.

In addition, cross-examination further revealed that the GSMLS listing for Montclair's 2018 tax year sale #3 states that "house was completely renovated . . . in 2011." The court's review of the GSMLS listing further discloses that the home contains a "finished basement with rec room. . . ." However, Montclair's expert made no adjustments to his 2018 tax year sale #3 to account for these condition variations because, in his opinion, the property was in "similar condition." In addition, the court's review of the GSMLS photographs for 2018 tax year sale #3 discloses that while the kitchen and kitchen appliances are of similar quality and condition to the subject property's, the master bathroom, full bathrooms, and half bathroom are fully renovated. Thus, the court finds sale #3 to be superior in condition to the subject property.

Therefore, the court finds that 2018 tax year sales #1 and #3 are not comparable and, thus, not competitive with the subject property and excludes them from consideration in determining the subject property's true market value.

Finally, the court notes that Montclair's expert acknowledged that 2018 tax year sale #2 contains a partially finished basement. However, Montclair's expert neglected to make an adjustment to sale #2 to account for this condition variation. Accordingly, the court will apply a downward adjustment to sale #2 to account for this condition.

2019 tax year

Cross-examination divulged that Montclair's expert conducted no paired-sale analysis, nor did he offer any market sales data supporting his 5% downward lot size adjustment of -$115,000 to 2019 tax year sale #1. Rather, the downward lot size adjustment was based solely on Montclair's expert's subjective opinion of what the lot size adjustment should be to account for the approximately 2/3-acre lot size disparity. As expressed above, "[i]f the bases for the






adjustments are not made evident the court cannot extrapolate value." Inmar Associates, 2 N.J. Tax at 66. Adjustments must be based on market-derived sources or objective data and not be based on subjective observations and/or personal experience. An appraiser's adjustments "must have a foundation obtained from the market. . . ." Greenblatt, 26 N.J. Tax at 55. Without adequate support for his opinion, the lot size adjustment utilized by Montclair's expert is entitled to no weight. Moreover, ignoring Montclair's expert's lot size adjustment would be inappropriate, as that would fail to recognize the potential difference the market ascribes to oversized lots.

In addition, cross-examination revealed the GSMLS listing for 2019 tax year sale #1 states that the home was "magnificently renovated" with a "brand new addition w/ ultra[-]sleek chef's kitchen, . . ." and "marble baths." However, Montclair's expert made no adjustments to his 2019 tax year sale #1 to account for these condition differences. The court's review of the GSMLS photographs discloses that while the kitchen is of similar quality and condition to the subject property, the master bathroom is fully renovated and is in substantially superior condition compared to the subject property's master bathroom. Moreover, 2019 tax year sale #1 contains an outdoor putting green, something the subject property does not possess. Finally, the subject property's butler's pantry, mudroom, and laundry area (in the unfinished basement) do not remotely resemble the butler's pantry and laundry room in sale #1, which is accurately characterized under the GSMLS as a "state-of-the-art mudroom and butler's pantry." Thus, the court finds sale #1 to be in a superior condition than the subject property.

Montclair's expert's 2019 tax year sale #2 is the identical property identified as 2018 tax year sale #3.[14] For the reasons expressed above, the court finds the extensive renovations to that

---

[14] The property was sold on June 6, 2017, and then resold on April 12, 2018.






property's master bathroom, full bathrooms, and half bathroom render it in superior condition and not comparable to the subject property.

Finally, cross-examination disclosed that the GSMLS listing for Montclair's 2019 tax year sale #3 states that the house was "[r]enovated/ 2007." Similarly, Montclair's expert made no adjustments to 2019 tax year sale #3 to account for the condition variations. In addition, the court's review of the GSMLS photographs for sale #3 discloses that while the kitchen is similar in quality and condition to the subject property's, the master bathroom and full bathrooms are renovated. Thus, the court finds sale #3 to be in a superior condition than the subject property.

Therefore, the court finds that 2019 tax year sales #1, #2, and #3 are not comparable and, thus, not competitive with the subject property and excludes them from consideration in determining the subject property's true market value.

2020 tax year

The court's review of the GSMLS listing for Montclair's 2020 tax year sale #1 states that the house was renovated in 2005. However, Montclair's expert made no adjustments to 2020 tax year sale #1 to account for the condition variations. In addition, the court's review of the GSMLS photographs for sale #1 discloses that while the kitchen is similar in quality and condition to the subject property's, the master bathroom and full bathrooms are renovated. Thus, the court finds sale #1 to be in a superior condition than the subject property.

Moreover, the court's review of the GSMLS listing for Montclair's 2020 tax year sale #3 states that the house was "completely renovated in 2010." In addition, the listing states, "spa-like bathroom with soaking tub, separate shower & double sinks." However, Montclair's expert made no adjustments to 2020 tax year sale #3 to account for these condition variations. The court's review of the GSMLS photographs for sale #3 discloses that the master bathroom is fully






renovated.  Thus, the court finds sale #3 to be in a superior condition than the subject property.

Finally, the court's review of the GSMLS listing for Montclair's 2020 tax year sale #4 states that the house was renovated in 2015.  The listing further states that "[a]ll bathrooms are beautifully designed and updated, the master-bath features underfloor radiant heating."  However, Montclair's expert made no adjustments to 2020 tax year sale #4 to account for these condition variations.  In addition, the court's review of the GSMLS photographs for sale #4 discloses that the master bathroom and full bathrooms are fully renovated.  Thus, the court finds sale #4 to be in a superior condition than the subject property.

Therefore, the court finds that Montclair's expert's 2020 tax year sales #1, #3, and #4 are not comparable and thus, not competitive with the subject property and excludes them from consideration in determining the subject property's true value.

Accordingly, for the 2018 tax year, the court will consider sales #2 and #4 as evidence of the subject property's value.  For the 2019 tax year, the court will consider sale #4 as evidence of the subject property's value.  For the 2020 tax year, the court will consider sale #2 as evidence of the subject property's value.

However, the court finds plaintiff's expert's testimony regarding the finished basement adjustment more credible than Montclair's expert.  The court's review of the photographs of the basement finishes for 2018 tax year sale #4, 2019 tax year sale #4, and 2020 tax year comparable sale #2 discloses attractive finishes, including recessed lighting, finished wood or wood-like flooring, additional half-bathrooms,[15] built-in wine cellar, media/screening rooms, and fitness/at-home gym areas.  These are key features that the subject property lacks, and the court finds more

---

[15]  Montclair's expert apparently omitted half-bathrooms located in the basement in his half-bathroom adjustment calculations.






credible plaintiffs' expert's testimony that the market would account for these material differences with a $50,000 adjustment in purchase price. Accordingly, the court will adjust each sale possessing a finished basement downwards by $50,000.

Therefore, applying the above-stated adjustments results in the following values: (i) 2018 tax year sale #2, $1,875,800; (ii) 2018 tax year sale #4, $1,622,500; (iii) 2019 tax year sale #4, $1,889,100; and (iv) 2020 tax year sale #2, $2,036,700.

     c.   Conclusion of true market value

"The trial judge as the factfinder is not bound by the opinion valuation of the experts on either side. Just as a jury, a judge may adopt 'so much of it as appears sound, reject all of it, or adopt all of it.'" Riorano, Inc. v. Weymouth Twp., 4 N.J. Tax 550, 564 (Tax 1982) (quoting State Highway Com. v. Dover, 109 N.J.L. 303, 307 (E. & A. 1932)).

For the 2018 tax year, the court accords greatest weight to 2018 tax year sale #4 as the residence is a similar age, condition, and contains a comparable gross living area, lot size, number of garages, and has an in-ground pool like the subject property. Accordingly, the court concludes the subject property's market value, as of the October 1, 2017 valuation date, is $1,675,000.

For the 2019 tax year, because the court rejected three of Montclair's expert's sales as being in a superior condition than the subject property, the court notes that, unfortunately, it is relying on one sale as evidence of value. Moreover, 2019 tax year sale #4 required approximately $314,100 in gross adjustments or 18% of its unadjusted sales price of $1,775,000. Accordingly, considering the gravity of the adjustments the court concludes the subject property's market value, as of the October 1, 2018 valuation date, is $1,800,000.

For the 2020 tax year, because the court rejected three of Montclair's expert's sales as being in a superior condition than the subject property, the court notes that again, unfortunately, it

   

is relying on one sale as evidence of value. In addition, the court emphasizes that 2020 tax year sale #2 was approximately 20% smaller than the subject property, requiring a material upwards adjustment of $204,700.00 to account for a 1,050 square foot gross living area disparity. In sum, 2020 tax year sale #2 required approximately $380,000 in gross adjustments or 22% of its unadjusted sales price of $1,757,000. Accordingly, considering the gravity of the adjustments the court concludes that the subject property's market value, as of the October 1, 2019 valuation date, is $1,850,000.

####    d.   Application of Chapter 123 Ratio

Having reached conclusions of the subject property's true market value, the court will turn its attention to a determination of the correct assessments for the 2018, 2019, and 2020 tax years.

Under N.J.S.A. 54:51A-6(a), commonly referred to as Chapter 123, when the court is satisfied in a non-revaluation year by the evidence presented "that the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit or falls below the lower limit of the common level range, it shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property. . . ." N.J.S.A. 54:51A-6(a). This process involves application of the Chapter 123 common level range. N.J.S.A. 54:1-35a(b).

However, in a revaluation year Chapter 123 is not applied. See N.J.S.A. 54:51A-6(d) (stating that Chapter 123 "shall not apply to any proceeding to review an assessment of real property taken with respect to the tax year in which the taxing district shall have completed . . . a district-wide revaluation program. . . ."). Accordingly, because Montclair conducted a district-wide revaluation program for the 2018 tax year, Chapter 123 is not applicable.

Here, the subject property's 2018 local property tax assessment is $1,670,600, and the court concluded a true market value of $1,675,000 for the 2018 tax year. However, "[i]n






a revaluation year the court will not increase the assessment above the assessor's or county board's determination, absent the filing of a counterclaim or a petition by the municipality." Passaic St. Realty Assoc. v. Garfield City, 13 N.J. Tax 482 (Tax 1993). See also Short Hills Assocs./Taubman Co. v. Millburn Twp., 20 N.J. Tax 352, 357 (2002) (concluding that "in a tax appeal occurring in a revaluation year, the only way the court can increase an assessment is by the taxing district prevailing on a timely filed counterclaim"). Since Montclair did not file a counterclaim for the 2018 tax year, the court will enter judgment affirming the subject property's 2018 local property tax assessment.

For the 2019 tax year, the ratio of assessed value, $1,670,600, to true market value, $1,800,000, yields a ratio of 92.81% ($1,670,600/$1,800,000 = 92.81%), which falls between Montclair's upper limit (100%) and lower limit (76.70%) of the Chapter 123 common level range. Consequently, no reduction or increase in the subject property's 2019 tax year assessment is warranted.

For the 2020 tax year, the ratio of assessed value, $1,670,600, to true market value, $1,850,000, yields a ratio of 90.30% ($1,670,600/$1,850,000 = 90.30%), which falls between Montclair's upper limit (100%) and lower limit (76.70%) of the Chapter 123 common level range. Consequently, no reduction or increase in the subject property's 2020 tax year assessment is warranted.






### III.  Conclusion

Accordingly, for the above-stated reasons, judgments affirming the subject property's 2018, 2019, and 2020 local property tax assessments shall be entered.

Very truly yours,

Hon. Joshua D. Novin, J.T.C.




